Opinion of the court delivered by
Judge Whyte.
Allen B. Grubbs, the ancestor of Nelson B. Grubbs, the lessor of the plaintiff in error, on the 29th of June 1819, registered himself for a life reservation under the treaty of the 27th February 1819, in the words and figures following, to wit: “June 29th 1819; Allen Burd Grubbs, in right of his children, two in family, on the creek above Major Walker’s mill, about two miles.”
This suit was commenced in the circuit court of M’Minn county in 1825, where it continued until April 1827; at which time it was transferred to the circuit court of Knox county, where it was tried, and a verdict and judgment rendered for the defendant, M’Clatchy.
By the bill of exceptions taken at the trial, it appeared that this reservation was surveyed by Robert Armstrong, under the authority of the United States. Seaborn Thorn, a witness in the case, proved, that in the summer of 1820, he took a lease of the reservation, and after the land sales he moved off of it, being informed the legislature had passed an act to put all purchasers at the sales in possession. He said his first acquaintance with Allen B. Grubbs was *433 in the winter of 1819, his home being then he believed on the reservation. George Colvin proved he first knew Grubbs in 1808, and his acquaintance continued until his death in 1823; that during that time, Grubbs lived in the Cherokee Nation the greater part of the time, but sometimes he lived in Blount, sometimes in Rhea county in this State. Ambrose Ague proved, that a man by the name of Cordial lived on the reservation until after the land sales, and until after M’Clatchy purchased it, and sent a man by the name of Banks to take possession of it. Being asked if Banks took possession of, or interfered wiih the house or improvement occupied by Cordial, or whether he used any threats or force towards Cordial, he answered none that he heard of.
The judge charged the jury, that any head of an Indian family residing on the ceded territory, or the territory ceded by the treaty of 1819, was entitled by the terms of that treaty, to a reservation of six hundred and forty acres of land, to include his improvements, if any he had, and if he had no improvement, then he might select a place any where within the ceded territory. That if a person had abandoned the country of which he was once a citizen, and had permanently settled within the Cherokee Nation, having married a woman of Indian blood therein, he was the head of an, Indian family. That loose parol testimony would not be sufficient to establish the fact, that such head of an Indian family had enrolled himself as an Arkansas emigrant; but that explicit parol testimony would be sufficient to establish that fact. That the voluntary removal of the ancestor from the reservation, destroys the whole right to a reservation, both in himself and his children. A new trial was moved for and refused, and an appeal in the nature of a writ of error taken to this court.
Two questions occur in this case, not presented by the record in Pathkiller’s case. First, whether the registry of a life reservation made after the last day of June 1818, is valid. Second, what acts by the head of an Indian •family for whom a reservation is made, constitute such a *434 removal therefrom, as to cause the right to revert to the „ „ United States.
As to the first question, whether the registry of a \\Ce reservation made after the last day of June 1818 is valid: this will depend entirely upon the construction to be given to the treaties of 1817 and 1819.
By the 8th article of the treaty of 1817, the registry of the name of each and every head of any Indian family residing on the east side of the Mississippi river, entitles him to a reservation of six hundred and forty acres; which registration of his name is to be filed in the office of the Cherokee agent, the office to be kept open for that purpose until the census should be taken, as stipulated in the third article of the treaty. By this third article, the time for registering the name for life reservations, is made co-extensive with the time given for taking the census. This common time to both, is, by the said third article, during the month of June 1818, and is to be acted upon by commissioners appointed by the President of the United States and the Cherokees. The history of the time shows us, that the census was not taken at the time appointed, and still the removal of the Cherokees to Arkansas continued, and consecutively in proportion to the numbers removed, the right of cession accrued to the United States, of lands lying east of the Mississippi.
Concomitant in time with removals beyond the Mississippi, were made registers of names.for life reservations of lands on this side of the Mississippi, which the United States cousider valid, as appears from the opinion of their attorney general, upon a case submitted to him by the government for that purpose.
Again, the preamble to the treaty of 1819, expressly recognizes the census as an existing stipulation at that time, that is on the 27th February 1819, for it says, “that the treaty between the United States and the Cherokees, signed the 8th July 1817, might without further delay, or the trouble or expense of taking the census, as stipulated in said treaty, be adjusted, &c.” And by the different articles of the treaty of 1819, it is so adjusted. The so *435 '■ond and seventh articles only have particular reference to the present question. The second article says, “and the United States do agree to allow a reservation of six hundred and forty acres to each head of any Indian family residing within the ceded territory, (those enrolled for the Arkansas excepted,) who choose to become citizens of the United States in the manner stipulated in said treaty.” This article recognizes and continues the right to claim reservations given by the eighth article of the treaty of 1817, for it says, “allow them in the manner stipulated in said treaty;” thus acting on the former rights declared by the said treaty. The seventh article says, “iu order to afford the Cherokces who reside on the lands ceded by this treaty, time to cultivate their crop next summer, and for those who do not choose to take reservations, to remove, the United States bind themselves to prevent the intrusion of their citizens on the ceded lands before the first January next,” thus giving until the first of January to take reservations.
The second question is, what acts by the head of an Indian family, for whom a reservation is made, constitute such a removal therefrom as to cause the right to revert to the United States?
It might, perhaps, admit of a qumre, whether this proviso attached to the third article of the treaty of 1817, was not introduced merely in terrorem, for the purpose of protecting the estate and interest given to the Indian, and expelling, as it were, the first approaches having a contrary intent; all experience proving, that the poor, ignorant, unlettered Indian, is a constant prey to the cupidity of the unprincipled portion of civilized society. But be this as it may, taking the proviso as a condition, it cannot (taking in view the whole treaty,) import less than such a removal must take place and exist, as is accompanied at the time with the total cesser of the quo animot with which the reservation was given by the United States, and received by the Indian. A simple, unexplained removal, without an intention of abandonment, will not do; neither will a temporary removal, for such *436 are compatible with the intention and object of the holding; much less will a removal produced by force, by fear, ]^y deception, or other insidious arts, (the offspring of fraud,) come within the meaning and purview of the treaty. All these may, and they ought to be defeated and redressed. The removal contemplated by the treaty to defeat the estate, must be one that is not only free from the foregoing exceptions, but must defeat and render nugatory the purpose of the gift or reservation, that is, a free and voluntary removal from the possession, accompanied with the intention of never returning for the purpose of engaging in the pursuits of agriculture and civilized life. Such, and such only, must be the character of the removal, that incurs a forfeiture to the head of an Indian family, and prevents the accruing of the reversion in fee simple to the children.
Is the removal spoken of in the record, of the kind to incur the forfeiture? The testimony of Thorn shews a misapprehension of the views of the legislature, that possession could not be held against the claim of a purchaser at the land sales; and Ambrose Ague proves, that Cordial lived on the reservation as tenant, until after the sales, and until M’Clatchy had sent a man by the name of Banks to take possession. And although to a question whether Banks took possession, or interfered with the house or improvement occupied by Cordial, or used any force or threats towards him, he answered “ none that he heard of;” yet the same witness says, that Cordial left the place in the spring after Banks came to the place.
Such testimony comes far short of the removal required to defeat the estate given under the treaty. The charge of the court upon this part of the case, to wit, “that the voluntary removal of the ancestor from the reservation, destroys the whole right of a reservation, both in himself and in his children,” gives but little information to the jury, and is too general in its nature, and too indefinite to direct them in a proper application of the testimony. In this respect the charge is defective and erroneous. The charge is also considered by the court incorrect in that *437 part which states, that “loose parol testimony would not be sufficient to establish the fact, that such head of an Indian family liad enrolled himself as an Arkansas emigrant, but that explicit parol testimony would be sufficient to establish that fact.”
Jarnagan and Meigs for plaintiff in error.
H. L. White for the state,
This charge admits the substitution of secondary, for primary evidence, and is contrary to the rule of law, that the best evidence which the nature of the case will admit of, and is in the power of the party, must be produced. The enrolment itself would have been the best evidence, and ought to have been produced, or its non-production accounted for, before the admission of the secondary parol evidence. All the other parts of the charge appear to be unexceptionable.
The judgment must be reversed, and the cause remanded for a new trial.
Judge Catron dissented. For his reasons, see the latter part of Pathkiller’s case, ante, page 407.
Judgment reversed..